UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **InCompass IT, Inc., and**<br>**HLI, L.L.C.,** | **Civil No. 10-3864 (SRN/JJG)** |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION<br>AND ORDER** |
| **XO Communications**<br>**Services, Inc., and**<br>**XO Communications, L.L.C.,** | |
| Defendants. | |

Alfred M. Stanbury, Stanbury Law Firm, P.A., 2209 St. Anthony Parkway, Minneapolis, Minnesota 55418, for Plaintiffs

Charles K. Maier & Kelly Hoversten, Gray Plant Mooty Mooty & Bennett, P.A., 80 South Eighth Street, Suite 500, Minneapolis, Minnesota 55402, for Defendants

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 58] and Defendants' Motion for Summary Judgment [Doc. No. 81]. For the reasons set forth herein, the parties' motions are denied.

**I.    FACTUAL BACKGROUND**

This action for promissory estoppel arises out of an alleged oral agreement between Plaintiffs InCompass IT, Inc. and HLI, L.L.C. (collectively, "InCompass") and Defendants XO Communications Services, Inc. and XO Communications, L.L.C. (collectively, "XO"). In early 2006, InCompass, a provider of managed IT services, was considering the relocation of its office of 1,670 square feet due to increasing space needs. (Am. Compl. ¶ 11.) Tim Lambrecht, InCompass's CEO, and Joe Hanson, his colleague, had previously formed a jointly-owned

company, Passageway, which purchased investment properties. (Lambrecht Dep. at 15 [Doc. No. 84-1], Ex. 1 to Decl. of Kelly Hoversten.) In late 2005, Lambrecht and Hanson began looking for a new building in which InCompass could relocate. (Id. at 25; 111-12.)

In early 2006, Lambrecht and Hanson viewed a property at 300 Second Street Northwest in New Brighton, Minnesota (the "Property"). (Id. at 37.) In an email to a potential mortgage lender, Lambrecht described the Property, noting that it consisted of 19,473 square feet, of which InCompass anticipated using approximately 10,000 square feet and leasing or renting the remaining space for $12-16 per square foot. (Email of 5/18/06 from T. Lambrecht to J. Hanson [Doc. No. 84-3], Ex. 3 to Hoversten Decl.) On May 25, 2006, Lambrecht and Hanson, as representatives of Passageway, signed a letter of intent to purchase the Property. (5/25/06 Letter from J. Hanson and T. Lambrecht to S. Chirhart [Doc. No. 84-3], Ex. 4 to Hoversten Decl.)

On June 7, 2006, after having signed the letter of intent, Lambrecht met with InCompass's account executive at XO, Scott McCrady, to discuss both general pricing matters on XO's services, as well as the possibility of XO leasing space in the Property. (Lambrecht Dep. at 63-64 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.) Later that day, Lambrecht followed up with McCrady by email in which he described the Property and represented that InCompass planned to use 7,200 square feet of the space. (Email of 6/7/06 from T. Lambrecht to S. McCrady [Doc. No. 84-4, Ex. 7 to Hoversten Decl.) In the email, Lambrecht stated, "Regarding the building in New Brighton, please let me know if there is any 'remote' interest in it ASAP." (Id.) In his deposition, Lambrecht acknowledged that McCrady was not "the decision-maker," and that he was simply trying to determine if XO would potentially rent space in the Property. (Lambrecht Dep. at 65 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.) McCrady responded to

2

Lambrecht's email, carbon copying XO's General Manager Unger, "I did inform my Market GM/VP John Unger of your new building purchase . . . . It is an interest of [sic] us; but John may be required to fulfill some task items first before investigating deeply about your building." (Email of 6/7/06 from T. Lambrecht to S. McCrady [Doc. No. 84-4], Ex. 7 to Hoversten Decl.)

On June 9, 2006, Passageway entered into a Purchase Agreement for the Property, for which it deposited $20,000 in earnest money. (Purchase Agmt. [Doc. No. 84-3], Ex. 5 to Hoversten Decl.) The Purchase Agreement permitted Passageway to cancel the purchase by August 8, 2006 without penalty. (Id. ¶ 10.)

On June 16, 2006, Lambrecht emailed his Passageway partner, Hanson, regarding the scheduling of a meeting at the Property with XO's Unger. (Email of 6/16/06 from R. Lambrecht to J. Hanson [Doc. No. 84-4], Ex. 9 to Hoversten Decl.) He noted that XO wanted a minimum of 15,000 square feet of space "ASAP," and "[w]e haven't discussed it, but it appears that they are willing to pay some good monthly rent!!!" (Id.) In his deposition, Lambrecht testified that he was simply communicating his excitement about the rental prospect, and acknowledged that as of June 16, 2006, XO had made no commitment to lease the property for which Passageway had entered into the Purchase Agreement. (Lambrecht Dep. at 78 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.)

On June 20, 2006, John Unger toured the Property with Lambrecht, as well as other properties of mutual interest to XO and InCompass. (Id. at 101-02; 109-09.) Lambrecht testified that at the time of the tour, Unger did not commit XO to leasing the Property. (Id. at 108-09.) Further, Joe Hanson testified that Unger first wanted to determine if the Property site had fiber optic connections. (Hanson Dep. at 82 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.)

This information would allow XO to better assess the cost of making the space useable for XO's data center needs. (Id.)

In June and July 2006, Hanson and Lambrecht toured additional properties. (Id. at 117-120.) On July 24, 2006, Lambrecht emailed Unger, discussing additional properties and setting forth his understanding of XO's space and technology needs. (Email of 7/24/06 from T. Lambrecht to J. Unger [Doc. No. 84-4], Ex. 10 to Hoversten Decl.) In particular, Lambrecht understood that XO required a minimum of 25,000 square feet with the potential for up to 60,000 square feet. (Id.)

On July 27, 2006, Lambrecht and Hanson also took Unger on a tour of several other buildings. (Lambrecht Dep. at 117-124 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.) Lambrecht testified in his deposition that after they had viewed the other properties, Unger told him that the Property was the "best option." (Id. at 143.) Unger, however, asserts that he "expressly told Mr. Lambrecht not to buy the Building" (Decl. of John Unger ¶ 9 [Doc. No. 93]), and in particular, not to buy the building with the expectation that XO would participate in leasing space. (Unger Dep. at 83 [Doc. No. 94-1], Ex. 1 to Second Hoversten Decl.)

Lambrecht had asked Hanson to bring a prepared written lease with him in case Unger was ready to sign it after touring the buildings on July 27. (Lambrecht Dep. at 125 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.) Lambrecht considered the document "the first draft." (Id. at 128.) Unger declined to sign it, stating, "We have attorneys for that, not real estate agents." (Hanson Dep. at 95-96 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.) The draft agreement was between Passageway and XO, for the lease of 15,000 square feet of space on the Property. (Draft Lease [Doc. No. 89-1], Ex. 1 to Decl. of Alfred Stanbury in Supp. Pls.' Mot.) Lambrecht

4

made handwritten notes on the draft lease during the meeting with Unger, apparently based on Unger's statements about XO's requirements. (Lambrecht Dep. at 128 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.) The notes include references to square footage, price per square foot, and the period of the lease. (Draft Lease [Doc. No. 89-1], Ex. 1 to Stanbury Decl.) On the last page of the draft lease, Lambrecht noted, "John - XO will add std other pieces ASAP." (Id.) Lambrecht contends that Unger specifically agreed to sign a triple-net 20-25 year lease for approximately 20,000 square feet (including the construction of a 5,000 square foot addition) at a rate of $22 per square foot (First Lambrecht Decl. ¶ 19 [Doc. No. 87]) – a fact directly refuted by Unger. (Unger Decl. ¶ 5 [Doc. No. 93].) Lambrecht also contends that Unger agreed that XO would start renting the data center space by December 31, 2006. (First Lambrecht Decl. ¶ 18 [Doc. No. 87].)

Defendants refute this characterization of events. Unger maintains that during his conversations with Hanson and Lambrecht, he never promised that XO would lease space from them, nor did he specifically agree to rent space in the Property by December 31, 2006. (Unger Decl. ¶¶ 3-4 [Doc. No. 93].)

Joe Hanson testified at his deposition that Unger did not possess all of the necessary details on July 27, 2006 and needed additional information from XO's data center group to determine the cost of making the building useable for XO. (Hanson Dep. at 100-01 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.) Hanson also testified that he and Lambrecht anticipated the receipt of a draft lease from XO's legal department shortly thereafter. (Id. at 109.) Lambrecht contends that Unger promised to reduce the lease to a writing before December 31, 2006. (First Lambrecht Decl. ¶ 20 [Doc. No. 87].) XO did not, however, provide such a draft. (Id. at 115.)

Also on July 27, 2006, Hanson and Lambrecht renegotiated their Purchase Agreement on the Property, primarily based on necessary roof repairs. (Id. at 86-89.) On that date, Passageway entered into a First Amendment to the Purchase Agreement, in which the seller agreed to place $185,000 of the $1.65 million purchase price of the Property into escrow for the roof repair. (Id.; First Amendment to Purchase Agmt. [Doc. No. 84-4], Ex. 11 to Hoversten Decl.) Under the terms of the First Amendment to the Purchase Agreement, Hanson understood that if Passageway chose not to purchase the property, it would forfeit its $20,000 earnest money deposit. (Hanson Dep. at 94 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.) Plaintiffs contend that they would not have entered into the First Amendment to the Purchase Agreement absent XO's agreement to lease space: "After verifying that Unger had authority and planned to sign a lease with us, Hanson and I immediately returned to InCompass' office and signed the purchase agreement addendum and faxed it to the sellers at 4:39 p.m. on July 27, 2006." (Lambrecht Decl. ¶ 26 [Doc. No. 87].) However, Unger asserts that he communicated to Lambrecht that he did not have the authority to sign a lease or to bind XO to a lease. (Unger Decl. ¶ 10 [Doc. No. 93].) No lease was provided or executed and neither Lambrecht nor Hanson apparently attempted to follow up with Unger about the lease. (Lambrecht Dep. at 154 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.; Hanson Dep. at 129 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.)

Prior to the property closing, Lambrecht and Hanson's financing source required them to create a new, single-asset limited liability corporation in order to purchase the Property. Consequently, they formed HLI during this time period. (Hanson Dep. at 117 [Doc. No. 84-2], Ex. 2 to Hoversten Decl.; Letter of 7/28/06 from St. Paul Port Authority to T. Lambrecht [Doc. No. 96-1], Ex. 1 to Stanbury Decl.) On August 9, 2006, HLI executed a lease, renting the entire

6

Property to InCompass as the tenant.  (Commercial Lease [Doc. No. 84-4], Ex. 15 to Hoversten Decl.)  On August 29, 2006, HLI closed on the purchase of the Property for $1,615,000.  Plaintiffs assumed monthly mortgage payments of $18,781.16, including taxes and utilities.  (Lambrecht Decl. ¶ 28 [Doc. No. 87].)

Lambrecht attests that he learned from Unger in December 2006, that Unger was chastised by XO's upper management "for promising to rent data center space in [the Property] and had been forcing him to use a corporate-sponsored realty search firm to find a building and decided to either rent or purchase an 80,000 square foot building in Eden Prairie."  (Id. ¶ 30.)  In addition, Lambrecht contends that because Unger felt badly about not leasing the space from InCompass, Unger proposed that XO's sales representatives market InCompass's monitoring services to "repair some of the damage."  (Lambrecht Dep. at 155-56 [Doc. No. 84-1], Ex. 1 to Hoversten Decl.; Lambrecht Decl. ¶ 31 [Doc. No. 87].)  Lambrecht contends that XO's sales representatives were to have been selling InCompass's services by the end of July 2007.  (Lambrecht Decl. ¶ 33 [Doc. No. 87].)  Before the arrangement was finalized, however, XO terminated Unger and the planned collaboration fell through.  (Lambrecht Decl. ¶ 34 [Doc. No. 87]; Unger Dep. at 38 [Doc. No. 94-1], Ex. 1 to Second Hoversten Decl.)

## II.   PROCEDURAL HISTORY

Plaintiffs filed this lawsuit in September 2010, alleging promissory estoppel arising out of the alleged oral lease agreement. (Compl. [Doc. No. 1].)  The parties engaged in discovery and participated in motion practice related to discovery requests.  In connection with the briefing on the instant summary judgment motions, Plaintiffs included an exhibit (Transcript of Telephone Conversation [Doc. No. 100-1], Ex. 1 to Second Lambrecht Decl.), attached to an

affidavit in support of their reply memorandum to their Motion for Partial Summary Judgment. Plaintiffs apparently filed the exhibit to counter assertions made in the Declaration of John Unger [Doc. No. 93], submitted by Defendants in response to Plaintiffs' Summary Judgment Motion.   Defendants moved to strike the exhibit, arguing that it was not produced consistent with discovery orders issued by Magistrate Judge Graham.  The Magistrate Judge denied Defendants' request to strike the exhibit, but granted Defendants' request for sanctions, due to the late disclosure.  (Order of 11/14/11 [Doc. No. 119].)  This Court affirmed Magistrate Judge Graham's ruling.  (Order of 1/3/12 [Doc. No. 133].)

At the time of the hearing on the instant motions, the issue of the admissibility of the transcript of the telephone conversation had not been ruled upon.  In Magistrate Judge Graham's Order, she found that consideration of the exhibit for purposes of the summary judgment motions was essentially moot, as the summary judgment hearing had already occurred.  Further, Magistrate Judge Graham deferred to the undersigned District Court Judge as to the admissibility of the exhibit for purposes of trial.  (Order of 11/14/11 at 12-13.)

This Court has reviewed the exhibit in question, but in light of the other evidence before the Court on the parties' cross motions for summary judgment, any consideration of the disputed transcript is not dispositive.  At most, the evidence is merely cumulative.  To the extent that the Court relies on it, if it all, it shall be cited herein.  Defendants remain free to seek to exclude the transcript from evidence at trial through a motion in limine.

Defendants now move for summary judgment, arguing that the statute of frauds bars Plaintiffs' promissory estoppel theory of recovery.  Specifically, Defendants argue: (1) that the undisputed facts show that XO did not make a clear and definite promise to lease space; (2) that Plaintiffs could not have reasonably relied on an alleged oral promise for an expensive, long-

term lease; (3) that enforcement of the promise is not required to prevent injustice; and (4) Plaintiffs lack standing to assert their claim because the alleged promise was made prior to HLI's existence. Plaintiffs respond that they do, in fact, have standing to assert their claim and that their claim is not precluded by the statute of frauds. Moreover, Plaintiffs contend that Defendants have not shown entitlement to the dismissal of Plaintiffs' claim.

In Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs argue that their claim satisfies all of the elements of promissory estoppel under Minnesota law and that the statute of frauds is not a defense to their claims. Defendants disagree, for the reasons set forth above with respect to Defendants' Motion.

### III.   DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Whisenhunt v. S.W. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Davenport v. Univ. of Ark. Bd. of Trustees, 553 F.3d 1110, 1113 (8th Cir.2009) (citing Anderson, 477 U.S. at 247–49).

### A.     Promissory Estoppel

Promissory estoppel is an equitable concept that will imply "a contract in law where none exists in fact." Grouse v. Group Health Plan, Inc., 306 N.W.2d 114, 116 (Minn. 1981) (citing Del Hayes & Sons, Inc. v. Mitchell, 230 N.W.2d 588, 593 (Minn. 1975)).  The elements of the doctrine of promissory estoppel are: (1) a clear and definite promise; (2) intended to induce reliance, and such reliance occurred; and (3) the promise must be enforced to prevent an injustice.  Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995).  Because promissory estoppel implies a contract where none exists in fact, such a claim may not proceed where a legally enforceable contract was formed.  Gorham v. Benson Optical, 539 N.W.2d 798, 801–802 (Minn. Ct. App. 1995). Promissory estoppel requires a plaintiff to show that he relied on a promise to his detriment.  Martens v. Minnesota Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000).

There is a genuine dispute of material facts with respect to Plaintiffs' promissory estoppel claim.  First, the parties dispute what representations were or were not made to each other regarding XO's possible lease of space in the Property, Unger's authority to enter into the agreement and XO's space and technology needs, among other things.  The existence of a clear and definite promise is hotly contested.  Also in dispute is whether Unger induced Lambrecht and Hanson to enter into the First Amendment to the Purchase Agreement on July 27, 2006.  Lambrecht, on behalf of Passageway, signed the agreement after meeting with Unger earlier that same day. The parties' accounts of that meeting and the representations made, if any, are widely divergent.   Plaintiffs contend that Unger claimed to have the authority to enter into the agreement, suggested alternative terms and agreed that XO's legal department would follow up with a draft lease.  Unger, however, disavows that he held himself out as authorized to enter into

any lease agreement.  Moreover, he contends that he expressly did not agree that XO would lease space in the Property.  The parties also dispute the extent to which Plaintiffs reasonably relied on XO's alleged representations and whether "injustice" will occur if the alleged agreement is not enforced.  Because the resolution of these factual issues directly affects the prima facie elements of the promissory estoppel claim, summary judgment for either party is unavailing.

### B.      Statute of Frauds

Defendant argues that the statute of frauds bars the alleged oral agreement because, under Minnesota law, contracts that are for a lease of more than one year must be in writing.  Minn. Stat. § 513.05.  There is no dispute that an alleged lease agreement was never reduced to a finalized writing.  Plaintiffs, however, argue that an exception to the statute of frauds applies to their promissory estoppel claim.

In limited circumstances, a promissory estoppel claim can remove an agreement from the statute of frauds.  Del Hayes, 230 N.W.2d at 593-94.  In Meshbesher & Spence, Ltd. v. Sprint Spectrum, L.P., 03-CV-3434 (JRT/SRN), 2004 WL 2801590, *4-5 (D. Minn. Nov. 19, 2004), this Court analyzed different approaches that the Minnesota Supreme Court had used to address whether a promissory estoppel claim can remove an agreement from the statute of frauds. Meshbesher arose out of a dispute involving a verbal agreement in which Sprint allegedly agreed to assume the lease of office space used by the plaintiff law firm.  Because the firm believed that Sprint would assume its office lease, the firm signed a purchase agreement for a different office building.  Sprint ultimately did not assume the law firm's lease and the firm filed suit on grounds of equitable estoppel, promissory estoppel and negligent misrepresentation.  Id. at *1-2. Addressing Sprint's summary judgment motion, this Court concluded that the Minnesota Supreme Court, if faced with the same case, would likely follow the approach of the Restatement

(Second) of Contracts and Williston. Id. at *5.  Under this approach, a promissory estoppel claim may defeat the statute of frauds when the plaintiff's detrimental reliance is "'of such a character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud.'" Id. at *4 (quoting Del Hayes, 230 N.W.2d at 594).  However, a "'[a] mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct . . . is not such a fraud as will justify disregarding the statute [of frauds].'" Id.

This Court held in Meshbesher that genuine issues of material fact existed as to whether Sprint's conduct would be considered unconscionable for purposes of the promissory estoppel claim.[1]  Id.  Specifically, the Court found that genuine issues of material fact existed as to whether Sprint's conduct could be considered unconscionable. Id.   The same is true with respect to the facts presently before the Court.  Because the parties have submitted directly conflicting evidence as to XO's actions and representations regarding the alleged agreement, as noted in the Court's discussion of the promissory estoppel claim, summary judgment based on the statute of frauds is unavailing.

**C.     Standing**

Finally, Defendants argue that Plaintiffs' claim fails for lack of standing.  Specifically, they contend that any alleged promise in this case would have been made to Passageway, the named landlord on the draft lease, and that HLI was not even in existence on July 27, 2006, when Unger allegedly promised that XO would lease space in the Property.  Plaintiffs respond

---

[1] Ultimately, the case was tried as a bench trial.  In its Findings of Fact, Conclusions of Law and Order for Judgment, the Court found that Sprint's conduct was neither akin to fraud nor unconscionable for the purposes of removing the alleged agreement from the statute of frauds. Meshbesher & Spence, Ltd. v. Sprint Spectrum, L.P., 03-CV-3434 (JRT/JSM), 2005 WL 1593054, *4 (D. Minn. July 6, 2005).

by arguing that Unger's alleged promise was made to Tim Lambrecht and Joe Hanson, then co-owners of Passageway. Further, Plaintiffs contend that one day after Passageway signed the First Amendment to the Purchase Agreement, the St. Paul Port Authority, acting as a financing entity, required Lambrecht and Hanson to create a new limited liability company simply in order to accomplish the financing. Plaintiff HLI was thus formed on August 9, 2006 (see State of MN Certificate of Organization [Doc. No. 96-2], Ex. 2 to Stanbury Decl. in Resp. to Defs.' Mot.), and that same day HLI leased the entire Property space to InCompass (HLI and InCompass Lease Agmt. [Doc. No. 84-4], Ex. 15 to Hoversten Decl.)

Standing requires that there be an injury-in-fact traceable to the actions of the defendant that is redressable by the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Defendants argue that InCompass and HLI have no standing to seek relief because XO made no promises to either of the named Plaintiffs. It is true that the draft lease agreement that Hanson brought to the July 27 meeting names Passageway as the "landlord." (Draft Lease [Doc. No. 84-4], Ex. 14 to Hoversten Decl.) While it appears that Passageway is not necessarily a defunct limited liability company, it also appears that, for purposes of the events at issue, Passageway functioned as a predecessor to HLI and HLI is a successor for these purposes. Also a limited liability company, HLI was formed at the behest of the entity financing the purchase of the Property. Nothing suggests that HLI is fundamentally different from Passageway. The same individuals behind Passageway, Tim Lambrecht and Joe Hanson, are identified as the organizers of HLI. (See State of MN Certificate of Organization [Doc. No. 96-2], Ex. 2 to Stanbury Decl.) XO's alleged promise to lease space in the Property was made by Unger to two persons – Lambrecht, the sole owner of InCompass and co-member of Passageway, and Joe Hanson, the other co-member of Passageway. HLI was organized one day after the financing entity required

a newly-formed limited liability company as a condition of financing the purchase of the Property.  (Id.; Letter of 7/28/06 from St. Paul Port Authority to T. Lambrecht [Doc. No. 96-1], Ex. 1 to Stanbury Decl.)

Defendants argue that Plaintiffs lack a connection to the alleged promise and do not qualify as third party beneficiaries.  Defendants cite the decision in Northern Nat'l Bank v. Wiczek, No. A10-1488, 2011 WL 1833100 (Minn. Ct. Ap. May 16, 2011), in which the court observed that Minnesota law allows a third party to sue on a contract under which the third party is an intended beneficiary.  In Wiczek, the court ultimately concluded that the Wiczeks could not recover as intended beneficiaries.  Id. at *4-5.  However, as Defendants also note, Wiczek dealt with a written contact and did not involve promissory estoppel claims, nor did it involve the issue of a different name or a name change.  The Court, therefore, is not persuaded that third-party beneficiary status is dispositive of whether Plaintiffs have standing in this case.

In Office Systems, Inc. v. Vacationaire, Inc., No. C2-99-1566, 2000 WL 310396, *2 (Minn. Ct. App. Mar. 28, 2000), which involved a written contract and did not involve the issue of standing, the court held that a corporate name change did not invalidate an existing lease.  The court further observed that under Minnesota law, a party may contract under an assumed name or doing business as a given entity.  Id. (citations omitted). Other courts have also found that a corporate name change, made after a contract was signed, does not foreclose the standing of the differently-named corporation to sue under the contract.  See, e.g., Oliver v. Omega Protein, Inc., 3:10cv47-REP-DWD, 2011 WL 1044403 (E. D. Va. Jan. 31, 2011) (holding that corporation had standing to seek relief under terms of the contract even though the contract was entered into by the predecessor corporation); Biever, Drees & Nordell v. Coutts, 305 N.W.2d 33, 37 (N.D. 1981) (holding that named plaintiff had standing to sue in the capacity of the firm which had merged its

14

operational aspects into the successor firm, consistent with the rights it would have had had it continued to operate as originally formed).

Based on the facts of this case, the Court finds that Plaintiffs have standing to sue. The alleged representations were made to Lambrecht, who was acting on behalf of InCompass and Passageway at the time, and Hanson, who was acting on behalf of Passageway. The two men created HLI simply because it was a condition of obtaining financing for the property. Moreover, this case does not involve a written contract, but an alleged oral promise. Therefore, Plaintiffs' standing should not be foreclosed because the name of Passageway, rather than HLI, appears on the draft lease that Hanson and Lambrecht brought to the July 27, 2006 meeting. For all of these reasons, Defendants' Motion for Summary Judgment based on standing is denied.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 58] is **DENIED**; and
2. Defendants' Motion for Summary Judgment [Doc. No. 81] is **DENIED**.

Dated: January 5, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge