# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| InCompass IT, Inc. (a Minnesota corporation) and HLI, LLC (a Minnesota limited liability company), | ) ) ) | Case No.:  10-cv-03864 (SRN/JJG) |
| | ) | |
| Plaintiffs, | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW,** |
| vs. | ) | **AND ORDER FOR JUDGMENT** |
| | ) | |
| XO Communications Services, Inc. (a Delaware corporation) and XO Communications, LLC (a Delaware limited liability company), | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

Alfred M. Stanbury, Stanbury Law Firm P.A., 2209 St. Anthony Parkway, Minneapolis, Minnesota 55418, for Plaintiffs

Charles K. Maier and Kelly W. Hoversten of Gray, Plant, Mooty, Mooty & Bennett, P.A., 80 South Eighth Street, Suite 500, Minneapolis, Minnesota 55402, for Defendants

---

SUSAN RICHARD NELSON, United States District Judge

This case arises out of an alleged oral agreement between Plaintiffs

InCompass IT, Inc. and HLI, L.L.C. (collectively, "InCompass") and Defendants

XO Communications Services, Inc. and XO Communications, L.L.C.

(collectively, "XO").  According to InCompass, XO failed to comply with its oral

promise to lease office space in a commercial building purchased by InCompass.

InCompass filed suit against XO alleging a claim of promissory estoppel.  This

matter was tried before the undersigned on March 12-15, 2012.  Based on the

evidence presented at trial, the legal arguments in the parties' pre-trial briefing, and all of the files and proceedings in this matter, the Court makes and enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1.  Plaintiff InCompass was established in 1996 by Tim Lambrecht, who is the company's CEO and President. (Tr. at 305-306, 392.)

2.  InCompass manages and remotely monitors customers' computer servers. (Tr. at 306.)

3.  Lambrecht and his colleague, Joe Hanson, formed Plaintiff HLI to purchase a building at 300 Second Street NW, New Brighton, Minnesota (the "Property"). (Tr. at 226.)

4.  Defendant XO Communications, LLC was the holding company for defendant XO Communications Services Inc. The bulk of XO's business is providing connectivity for internet and data communications for businesses. (Tr. at 21.)

5.  InCompass and XO formed a business relationship in approximately 2001-2002, when InCompass began using some of XO's technology. (Tr. at 308.) InCompass also received referral business from XO. (Tr. at 363.)

6.  In late 2005, Lambrecht was considering the relocation of InCompass' corporate offices. Lambrecht considered purchasing a building through a company he and Hanson jointly owned, Passageway, which they had

used to purchase three condominiums in the past.  (Tr. at 239-240; 312; 393-394; Ex. D-1, D-2.)

7.      Hanson is a licensed real estate agent and was involved in past real estate transactions on behalf of Passageway.  In that capacity, Hanson looked at various buildings for Passageway to purchase and lease to InCompass.   (Tr. at 238-240.)

8.      Between October 2005 and April 2006, Lambrecht and Hanson, through Passageway, sent several written letters of intent regarding buildings in and around the Twin Cities. These were buildings that Passageway was interested in purchasing and leasing to InCompass.  Each of the letters of intent executed by Passageway stated that the letter "is intended to outline initial terms for consideration only and will not obligate any party contractually, and no such obligation will arise unless and until a mutually satisfactory Purchase Agreement is fully executed by, and delivered to all parties."   (Ex. D-1, D-2, D-4, D-9; Tr. at 240-247.)

9.      The letters of intent also reflect that the offers to purchase were contingent upon certain additional conditions relating to title work, an environmental assessment, an inspection, and an arrangement for suitable financing.  (Ex. D-1, D-2, D-4, D-9; Tr. at 240-247.)

10.      Lambrecht and Hanson understood that although the letters of intent contained price information and some other details, they were not binding agreements.  Contingencies reflected in the letters of intent would need to occur

and additional documentation would need to be executed before there would be a binding agreement.  (Tr. at 240-243, 394-395.)

11.     Lambrecht and Hanson first viewed the subject Property in late 2005 or early 2006.  (Tr. at 260.)

12.     On May 25, 2006, Lambrecht and Hanson, as representatives of Passageway, signed a letter of intent to purchase the Property.  That letter contained the same contingencies as the other letters of intent Passageway had executed over the past several months, and included the same acknowledgement that the letter of intent "is intended to outline initial terms for consideration only and will not obligate any party contractually, and no such obligation will arise unless and until a mutually satisfactory Purchase Agreement is fully executed by, and delivered to all parties."  (Ex. D-13; Tr. at 247.)

13.     On June 6, 2006, Hanson received a draft purchase agreement for the Property.  (Tr. at 251.)

14.     On June 7, 2006, Lambrecht met with InCompass's account executive at XO, Scott McCrady, to discuss the pricing that XO was offering InCompass on telecommunications services and to exchange referral business contacts.  They also discussed the Property.  (Tr. at 320-321; 416-17; Ex. P-14.)

15.     In a June 7, 2006 email to McCrady following their meeting that morning, Lambrecht mentioned the Property and asked if XO had "any remote interest" in leasing a portion of the Property.  (Ex. P-14; Tr. at 416-418.)

16.     McCrady responded with an email, stating that he told his General Manager, John Unger, about Lambrecht's "new building purchase."   McCrady commented that XO might be interested, but Unger "may be required to fill in some task items first before investigating deeply into your building."  (Ex. P-14; Tr. 416-418.)

17.     Lambrecht sent three emails to McCrady and another email to Unger to schedule a time for Unger to tour the Property.  (Ex. D-17, D-18; Tr. at 420-422.)

18.     On June 9, 2006, Passageway entered into a Purchase Agreement for the Property and deposited $20,000 of earnest money into escrow.  (Ex. D-15; Tr. at 253, 327.)

19.     Pursuant to Section 10 of the Purchase Agreement, Passageway could cancel the Purchase Agreement without penalty through August 8, 2006. (Ex. D-15; Tr. at 253-254, 327.)

20.     Prior to entering into the Purchase Agreement, no representative of Passageway communicated with any decision maker from XO about leasing the Property and no one from XO had seen the building.  (Tr. at 255, 419-420.)

21.     Lambrecht believed XO was in the market for additional space for a data center, so he was "proactive" about approaching XO to lease the Property. (Tr. at 315-316, 418-419.)

22.     A data center is a facility in which XO's customers could store their computers, with XO providing security and power backup for those customers' computers and their networks.  (Tr. at 21.)

23.     Lambrecht emailed Hanson on June 16, 2006, indicating that he had been meeting with XO regarding the Property and that XO wanted "a MINIMUM of 15,000 [square feet] of it ASAP."  (Ex. D-16, P-15; Tr. at 332-335, 386-387, 420.)

24.     As of June 16, 2006, Lambrecht's discussions about the Property with XO had been with McCrady, Lambrecht knew McCrady was not a decision maker, no one from XO had seen the Property, and XO had not committed to leasing the Property.  (Tr. at 391-392, 415, 419-420.)

25.     On June 19, 2006, Lambrecht represented to his property inspector, however, that Passageway was "locked into" the Property.  (Ex. D-20; Tr. at 257-58.)  Lambrecht further stated, "We 'may' have rented a pretty large portion of the building already and may need your help with renovation."  (D-20.)

26.     On June 20, 2006, Lambrecht and Hanson met with Unger to tour the Property.  (Tr. at 261, 336.)

27.     The parties agree that Unger did not agree to lease the Property on XO's behalf on June 20, 2006.  (Tr. at 261.)

28.     Unger testified that he told Lambrecht and Hanson that his interest in the Property was small, in part because the building was not large enough.  In addition, Unger needed to verify how close the XO fiberoptic network ("fiber")

was to the Property, and if XO could access another provider's fiber, before he could determine whether XO could use the Property for a data center. (Tr. at 112-113.)

29.     Fiberoptic connectivity is required to enable XO's customers to access the computers they house in XO's data center. (Tr. at 26.)

30.     Unger subsequently learned that the Property was "off the beaten path," i.e., miles from XO's fiber. The only fiber relatively close to the Property was owned by Qwest. XO would not be able to obtain access to Qwest's fiber at a cost-effective price. (Tr. at 113-114, 587-588.)

31.     XO's Regional Director for the Pacific Northwest, Shawn Adamson, who was XO's General Manager for the State of Utah in 2006, testified that her position in Utah was the same as that of John Unger in Minnesota in 2006. Adamson testified that it would have been too expensive for XO to purchase fiber from Qwest to connect to the Property. She attempted to negotiate a similar arrangement in 2006 with Qwest in another region and found it to be cost-prohibitive. (Tr. 579-80, 586-588).

32.     XO's current Director of Sales for Data Center Services, Mark Feil, testified that it would not make sense for XO to use fiber owned by a competitor, such as Qwest, because it would cost a substantial amount of money on an ongoing basis. Feil also testified that, due to the Property's distance a number of miles away from XO's existing fiberoptic network, it would be cost prohibitive –

"well into the multiple millions" – for XO to establish its own fiberoptic network to the Property.  (Tr. at 25-27.)

33.     After their meeting with Unger on June 20, 2006, Hanson and Lambrecht continued to identify other properties for XO to view.  (Tr. at 426.)

34.     Unger testified that sometime between June 20, 2006 and July 24, 2006, he told Lambrecht that it was "highly unlikely" that XO would pursue the use of the Property.  If Lambrecht wanted XO to lease space, the building needed to meet XO's criteria, including that it be a larger facility, closer to XO's fiber network and all-brick construction.  (Tr. at 114-115.)

35.     In a July 24, 2006 email to Unger, Lambrecht outlined his understanding of the criteria XO would require for a potential data center, including fiber optic capability and a minimum of 25,000 square feet with the potential to have 60,000 square feet or more.  (Ex. D-23; Tr. at 426-427.)

36.     The subject Property has less than 20,000 square feet of space.  (Ex. D-11.)

37.     In June or July 2006, Hanson determined that the roof on the Property needed to be repaired.  Pursuant to negotiations with the seller, a First Amendment to Purchase Agreement ("APA") was drafted, which provided that the seller would place $185,000 of the $1,615,000 purchase price into escrow for roof repair.  (Tr. at 259-261, 353-355; Ex. D-25, P-4.)

38.     Section 2.b of the APA waived the right that Passageway had under Section 10 of the original Purchase Agreement to terminate the contract for any reason, and without penalty, prior to August 8, 2006.  (Tr. at 355; Ex. D-25, P-4.)

39.     Under the APA, Passageway had until 5:00 p.m. on July 27, 2006 to decide whether it would sign the APA.  Once it signed the APA, Passageway could subsequently decline to purchase the Property, but it would then forfeit its $20,000 earnest money deposit.  (Tr. at 355; Ex. D-25, P-4.)

40.     On July 27, 2006, Lambrecht and Hanson took Unger on a tour of several buildings that they had identified over the previous several weeks.  (Tr. at 262-263, 339-340, 343-344; Ex. D-23, D-24, D-26.).

41.     On July 27, 2006, the parties visited the Property for a second time. (Tr. at 116.)

42.     Prior to the July 27, 2006 meeting, Lambrecht had asked Hanson to draft a lease for the Property.  The document identifies Passageway, LLC as the landlord and XO Communications as the tenant.  (Tr. at 340-341; Ex. D-27, P-35.)

43.     While the parties dispute whether InCompass ever provided the proposed lease to XO, they agree that Unger never signed it.  Hanson stated that when he handed the draft lease to Unger, Unger declined to sign it, indicating that any lease would have to be prepared by XO's legal or real estate departments.  (Tr. at 55, 264, 268.)

44.     During the July 27, 2006 tour of the Property, Lambrecht made contemporaneous, handwritten notes on the draft lease of what he contends were

Unger's statements concerning what XO would want in a lease.  His handwritten notations relate to a range of square footage, the date on which the lease might begin, the term, and a range of prices per square foot, among other items.  On the final page, Lambrecht made a note reading "John- XO will add std other pieces ASAP."  (Ex. D-27, P-35; Tr. at 345-351, 431-432.)

45.     Lambrecht acknowledged at the July 27, 2006 meeting that the parties had not yet agreed upon several specific terms for the lease, including the square footage, price per square foot, and the term.  (Tr. at 428-430.)

46.     Lambrecht testified that his understanding after the July 27, 2006 meeting was that Hanson and Unger were going to work out actual terms of a lease within 30 to 40 days, but that XO had promised to lease the building.  (Tr. at 345; 351; 431-432; 449-450.)

47.     After the July 27, 2006 meeting, Hanson expected that Unger would perform due diligence regarding build-out costs for the Property and that XO would not go forward with the Property until it had determined those costs more precisely.  Hanson also understood that XO would add new terms to a draft lease, including the right of first refusal and a provision for automatic renewal.  He acknowledged that he needed to see XO's proposed terms before agreeing to them. (Tr. 267-269).

48.     Lambrecht and Hanson never received documentation from XO regarding additional terms that Unger purportedly wanted to add to a lease for the

Property, and never received a draft lease from XO.  (Tr. at 226; 269, 428-431, 443, 448-450.)

49.     Unger testified that when touring the buildings with Lambrecht and Hanson on July 27, 2006, he indicated that the Property was too far from XO's fiber, that InCompass might want to pursue it, but that XO would not participate in leasing space in the building.  (Tr. 116-117.)

50.     Mark Feil visited the Property at some point in 2011-2012 and confirmed that the Property would be too small for XO's needs, too far away from XO's fiberoptic network and that it would be too costly to add a fiberoptic network to the Property.  (Tr. at 25-27.)

51.     Unger testified about XO's process for approving and building out a data center.   (Tr. at 96-106.)  Current XO employees Mark Feil and Shawn Adamson, as well as former employee Todd Meester – all of whom are or were a General Manager at XO – testified consistently with Unger about that process.  (Tr. at 22-25, 143-45; 581-584, 588-591).

52.     Generally, an XO General Manager would identify a customer's need for a data center and assist with finding suitable space.  XO's engineering department would then determine the cost to build out the space to make it suitable for a data center.  Then a business case would be presented to the finance department, with ultimate approval coming from XO's CFO.  (Tr. 22-25, 96-101, 144, 581-584, 588-591.)

53.     In total, the process to approve a new data center would typically involve approximately 20-25 people and take at least eight weeks.  (Tr. at 24, 591.)

54.     Unger explained that he understood the process in 2006 and would have followed it when building out a data center, as he had done for previous XO data center projects.  (Tr. at 106.)

55.     After Lambrecht and Hanson parted company with Unger on the afternoon of July 27, 2006, Lambrecht signed the APA for the Property, on behalf of Passageway.  Hanson and Lambrecht returned the APA to the seller shortly before the 5:00 p.m. deadline that day.  (Ex. D-25, P-4; Tr. at 354-356.)

56.     At their lender's request, in August 2006, Lambrecht and Hanson formed a new company, HLI, to purchase the Property.  (Tr. at 226; Ex. D-30.)

57.     As part of obtaining financing for the purchase of the Property, HLI's lender demanded a signed lease for the Property.  Hanson described the lease as a necessity for the transaction.  On August 9, 2006, HLI executed a lease renting the entire Property to InCompass as sole tenant, and provided that signed lease to its lender as evidence of HLI's ability to service the debt on the Property. XO is not referenced in the document.  (Ex. D-31; Tr. at 271-273.)

58.     HLI intended its lender to rely on the executed lease between HLI and InCompass, and the lender did so, as evidenced by its decision to provide financing for HLI to purchase the building.  (Tr. at 272-273; Ex. D-35, D-36.)

59.     On August 29, 2006, HLI closed on the Property.  As a condition of finalizing the sale, both Lambrecht and Hanson executed personal guarantees for $1,400,000.  (Ex. D-35, D-36, D-37, D-38, D-39; Tr. at 274-275.)

60.     Hanson testified that he contacted Unger a few days after July 27, 2006 to inquire about the lease documents.  He recalled that Unger indicated it would take about 30 days for XO to get back to InCompass.  (Tr. at 224-25.) Lambrecht had lunch on August 16, 2006 with InCompass salesperson Mike Nelson and XO's Scott McCrady to discuss collaboration between the two companies.  (Tr. at 356-57; P-45.)  The Property was mentioned during the lunch, but McCrady had heard no details about it from Unger.  (Tr. at 358.)  Lambrecht had no conversations with Unger between the July 27, 2006 meeting and the August 29, 2006 real estate closing, although he acknowledged that he had Unger's cell phone number. (Tr. at 478-79.)   Lambrecht testified that on August 30, 2006, he left a voicemail message for Unger, indicating that HLI had closed on the Property and that they needed to move forward. (Tr. at 358-59.)  Unger recalled no such contact between him, Lambrecht and Hanson about the Property during this time period.  (Tr. at 120.)

61.     On October 16, 2006, Lambrecht testified that he spoke with Unger by phone, at which time he learned that XO would not lease the Property.  (Tr. at 360.)  Hanson learned in November or December 2006 that XO was not going to lease the Property.  (Tr. at 227-28; 275.)

62.     Lambrecht testified that he communicated frequently with XO in 2006.  He described his relationship with Scott McCrady at that time as "tight" (Tr. at 414), and the collaboration between the two companies as "very tight knit." (Tr. at 309).  Lambrecht further stated that he dealt with Unger "all the time."  (Tr. at 309.)  When Jeff Horgan subsequently became the XO account manager responsible for InCompass, Horgan communicated with Lambrecht approximately once a month.  (Tr. 185-186.)

63.     Todd Meester, Greg Kenfield and Jeff Horgan, Minnesota XO employees with the company in 2006, testified that they had not heard of an alleged lease for the Property or an agreement to lease the Property.  (Tr. at 146, 177-78, 185-186.)  Scott McCrady testified that in 2006, he was aware that InCompass wanted XO to look at a building (Tr. at 154), but never heard of XO working to obtain approval for leasing the Property.  (Tr. at 166.)  Todd Meester, Scott McCrady and Jeff Horgan testified at trial that they were aware of a potential new data center in Eden Prairie, Minnesota that XO was exploring in 2007, although that project never came to fruition.  (Tr. at 140-43, 154-155, 166-167, 182-183).

64.     HLI purchased the Property on August 27, 2006 for less than its August 1, 2006 "as complete" appraised value.  The tax assessed value of the Property, as reflected in property tax statements, rose from 2006 to January 2, 2008, when it reached $1,680,800 (which was $65,800 more than the purchase price).  (Tr. 410-11; Ex. D-28, D-34, D-76).

65.     Hanson was not sure that Plaintiffs would be able to keep the

Property.  He testified that after learning that XO would not lease the Property, he

initially attempted to find a lessor or a buyer himself, but Plaintiffs did not hire a

real estate listing broker.  (Tr. at 229-30.)  Hanson explained that they did not hire

a broker because they were unable to pay for such services up front.  (Tr. at 230.)

For approximately a year and a half, Hanson sent letters of inquiry to tenants

whose names were listed on tenant rosters in other buildings to see if they might

be interested in the Property.  (Tr. at 231.)  After his approach proved

unsuccessful, Plaintiffs eventually hired a broker in 2008.  (Tr. at 234.)

## CONCLUSIONS OF LAW

1.      Minnesota's statute of frauds provides that "[e]very contract for the

leasing for a longer period than one year or for the sale of any lands, or any

interest in lands, shall be void unless the contract, or some note or memorandum

thereof, expressing the consideration, is in writing and subscribed by the party by

whom the lease or sale is to be made, or by the party's lawful agent thereunto

authorized in writing…"  Minn. Stat. § 513.05.

2.      The Minnesota Court of Appeals has noted that Minnesota law is

unsettled as to whether a claim of promissory estoppel is viable in the face of a

statute-of-frauds defense:

> Under one possible interpretation of the law, "promissory estoppel will
> defeat the statute of frauds only when the promise relied upon is a promise
> to reduce the contract to writing." Del Hayes & Sons, Inc. v. Mitchell, 230
> N.W.2d 588, 593–94 (Minn. 1975); see also Lunning v. Land O'Lakes, 303
> N.W.2d 452, 459 (Minn. 1980). Under another possible interpretation,

> promissory estoppel will defeat the statute of frauds only if "the detrimental reliance is of such a character and magnitude that refusal to enforce the contract would permit one party to perpetuate a fraud." <u>Del Hayes & Sons</u>, 230 N.W.2d at 594.

<u>RKL Landholdings, LLC v. Appliance Recycling Centers of America, Inc.</u>, No. A10-1571, 2011 WL 2175855, *4 (Minn. Ct. App. June 6, 2011) (unpublished). This Court has previously observed that, in certain circumstances, promissory estoppel can remove an oral agreement from the statute of frauds. <u>Meshbesher & Spence, Ltd. v. Sprint Spectrum, L.P.</u>, 03-CV-3434 (JRT/JSM), 2005 WL 1593054, *4 (D. Minn. July 6, 2005) (unpublished) (citing <u>Meshbesher & Spence, Ltd. v. Sprint Spectrum, L.P.</u>, 03-CV-3434 (JRT/JSM), 2004 WL 2801590, *4 (D. Minn. Nov. 19, 2004) (unpublished) (quoting <u>Del Hayes</u>, 230 N.W.2d at 594). Promissory estoppel is an equitable concept that will imply "a contract in law where none exists in fact." <u>Grouse v. Group Health Plan, Inc.</u>, 306 N.W.2d 114, 116 (Minn. 1981) (citing <u>Del Hayes</u>, 230 N.W.2d at 593. A claim of promissory estoppel requires a plaintiff to prove that: (1) a clear and definite promise was made; (2) the promisor intended to induce reliance, and such reliance occurred; and (3) the promise must be enforced to prevent injustice. <u>Martens v. Minnesota Mining & Mfg. Co.</u>, 616 N.W.2d 732, 746 (Minn. 2000). This Court, applying Minnesota law on the doctrine of promissory estoppel to an alleged oral lease agreement, has found that the detrimental reliance must be "of such a character and magnitude that refusal to enforce the contract would permit one party to perpetuate a fraud." <u>Meshbesher</u>, 2005 WL 1593054 at *4 (citing <u>Meshbesher</u>,

2004 WL 2801590 at *4 (quoting Del Hayes, 230 N.W.2d at 594).   "A mere

refusal to perform an oral agreement, unaccompanied by unconscionable conduct .

. . is not such a fraud as will justify disregarding the statute [of frauds]." Del

Hayes, 230 N.W.2d at 594.

      3.     Plaintiffs' claim is premised upon an alleged oral lease that is barred

by the statute of frauds unless Plaintiffs can establish, by a preponderance of the

evidence, all of the elements of their promissory estoppel claim.  In order to assert

a claim of promissory estoppel, Plaintiffs must prove that (1) XO made a clear and

definite promise; (2) XO intended and did induce reliance; and (3) justice requires

enforcement of the promise against XO.  Martens, 616 N.W.2d at 746.

      4.     The Court finds that XO did not make a clear and definite promise to

lease the Property.  In Ruzicka v. Conde Nast Pubs., Inc., 999 F.2d 1319, 1321

(8th Cir. 1993), the Eighth Circuit found that Minnesota law does not impose a

higher standard for specificity of a promise under promissory estoppel than under

contract law.  In fact, the Eighth Circuit noted that Minnesota law might support a

lower standard for specificity of a promise under promissory estoppel than under

contract law.  Id., n.4.  Even if the Court were to apply a less exacting standard for

a clear and definite promise to Plaintiffs' claim, it nonetheless fails.  Terms critical

to any lease agreement, whether oral or written, were not determined as of the date

of the alleged oral agreement, nor anytime thereafter.  Plaintiffs conceded that

even after the July 27, 2006 meeting at which they contend Unger promised to

lease the Property, the parties still had not agreed upon the square footage, rental

rate, duration of a potential lease, right of first refusal, or right of automatic renewal, among other terms.  Hanson conceded that he expected to receive additional terms from XO and, moreover, he <u>needed</u> to see those terms before even he could agree to them.  Lambrecht testified that Hanson and Unger were to work out the lease terms in 30 to 40 days.  There is no dispute that Plaintiffs never received definite lease terms from XO.

5.      While Hanson and Lambrecht testified that they had an oral agreement on July 27, 2006, Unger testified to the contrary – that XO found the Property unsuitable for XO's needs and that he told Plaintiffs so.  While Hanson and Lambrecht contend that Unger agreed to reduce the alleged oral promise to a writing, the evidence shows that essential lease terms were not resolved or agreed-upon.  Moreover, Unger's testimony about XO's general business practice with respect to leasing data center space was corroborated by other XO witnesses. Unger and other XO witnesses established that it was not possible that Unger would have made a promise for XO to lease the Property because the space lacked connection to XO's fiberoptic network and the cost to build out XO's network to the Property was very prohibitive.  In addition, the testimony from Unger and XO witnesses showed that the general process by which XO built out a data center involved many layers of consultation and approval with engineers, legal counsel and top management.

6.      Further, following the July 27, 2006 meeting, but prior to signing the APA, Plaintiffs did little to follow up with XO on the finalization of the alleged

agreement.  Hanson made one phone call to Unger regarding the lease.  Lambrecht had no conversations with Unger about the alleged lease. For each of these reasons, the Court finds that Plaintiffs have not met their burden to establish that XO made a clear and definite promise to lease the Property.  Accordingly, Plaintiffs' claim fails.

7.      Even if the evidence did support a finding of a clear and definite promise, the Court finds that Plaintiffs failed to establish that XO intended to induce reliance and failed to establish that Plaintiffs reasonably relied on XO's alleged promise.  As noted in <u>Meshbesher</u>, "the question to be asked when determining reasonable reliance is not whether the representation would deceive the average [person] . . . (but rather) whether the representations were . . . calculated to deceive . . . a person of the capacity and experience of the particular individual who received the representations." 2005 WL 1593054, at *5 (quoting <u>Berg v. Xerxes-Southdale Office Bldg Co</u>., 290 N.W.2d 612, 616 (Minn. 1980)). Lambrecht and Hanson had participated in previous commercial real estate ventures through Passageway and Hanson himself was a licensed real estate agent. Their past experience and business acumen gave them a level of understanding that such transactions typically involve multiple stages and require signed agreements.  Further, Plaintiffs' real estate experience should have led them to ask additional questions of XO to verify XO's alleged commitment when a lease agreement failed to materialize.

8.     Plaintiffs entered into a letter of intent to purchase the Property on

May 25, 2006, before receiving any alleged promises from XO to lease the space.

In fact, no one from XO had even seen the Property until June 20, 2006.  Prior to

signing the APA, Plaintiffs could have declined to purchase the Property without

incurring any penalty.  After signing the APA on July 27, 2006, only $20,000 of

Plaintiffs' earnest money was at risk.  Instead of forfeiting their earnest money,

Plaintiffs proceeded with the purchase, without any written agreement from XO.

At the August 29, 2006 closing, Plaintiff HLI committed $1,615,000 for the

Property, and Lambrecht and Hanson executed $1,400,000 personal guarantees

without confirming and verifying XO's alleged lease commitment.

9.     On August 9, 2006, HLI signed a written lease with InCompass to

confirm for its lender that the Property would provide sufficient cash flow to

service the debt.  The lease made no reference to XO despite Plaintiffs' contention

that XO previously committed to lease the Property.  In the 32 days between the

alleged oral lease agreement on July 27, 2006, and the closing on August 29, 2006,

Plaintiffs apparently only made one phone call to John Unger about the alleged

lease.  Lambrecht, who had Unger's cell phone number and who was in frequent

contact with XO due to the collaborative, "tight-knit" relationship between

InCompass and XO, could have telephoned XO about the alleged missing lease

and XO's alleged commitment to lease the Property.   In Meshbesher, this Court

found it was unreasonable for the plaintiff law firm to rely on past dealings with

the defendant and unreasonable to rely on the defendant's silence in response to

the plaintiff's letter, which purported to memorialize the parties' understanding of the alleged lease.  2005 WL 1593054 at *5.  Here, although Hanson testified that Unger gave him an oral assurance when he telephoned him a few days after the alleged promise was made, Plaintiffs otherwise initiated little, if any, substantive follow-up contact.  As in Meshbesher, the Court finds it unreasonable here for Plaintiffs to have relied on XO's silence.

10.     Plaintiffs' failure to substantively communicate with XO after the July 27, 2006 meeting about the alleged agreement, their failure to include XO in the signed lease for the Property that they gave to their lender, and their understanding that commercial real estate transactions typically proceed in numerous stages and with extensive documentation, demonstrate that Plaintiffs did not reasonably rely on any statements made by Unger regarding XO's possible interest in leasing the Property.

11.     Enforcement of XO's alleged promise is not required to prevent injustice or remedy an unconscionable situation.  After unequivocally learning that XO would not lease the Property in the fall of 2006, there is no evidence that Plaintiffs attempted to hold XO to its alleged promise until the filing of this lawsuit in 2010.  Plaintiffs attempted to sell or lease the Property for a year and a half before hiring a professional broker.   Moreover, Plaintiffs, as owners of the Property, retain a valuable real estate asset.  Tax records show that, as of January 2008, the Property was worth more than Plaintiffs paid for it.

12.     To avoid the statute of frauds, Plaintiffs must show that XO engaged in conduct amounting to a misrepresentation or concealment of material facts. There is no evidence in the record to support such a finding.


## **ORDER FOR JUDGMENT**

Based on the Court's Findings of Fact and Conclusions of Law, it is hereby ORDERED that judgment be entered in favor of Defendant and against Plaintiffs.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


July 5, 2012                              s/Susan Richard Nelson
                                         Susan Richard Nelson
                                         United States District Court Judge